UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
RICHARD PELTZ-STEELE,                   )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        CIVIL ACTION
                                        )        NO. 21-11590-WGY
UMASS FACULTY FEDERATION, LOCAL         )
1895 AMERICAN FEDERATION OF             )
TEACHERS, AFL-CIO; MARTAN MEEHAN,       )
IN HIS OFFICIAL CAPACITY AS             )
PRESIDENT OF THE UNIVESRITY OF          )
MASSACHUSETTS; MARJORIE WITTNER,        )
KELLY STRONG, AND JOAN ACKERSTEIN,      )
IN THEIR OFFICIAL CAPACITIES AS         )
MEMBERS OF THE COMMONWEALTH             )
EMPLOYMENT RELATIONS BOARD; and         )
MAURA HEALEY, IN HER OFFICIAL           )
CAPACITY AS ATTORNEY GENERAL OF         )
THE COMMONWEALTH OF MASSACHUSETTS       )
                                        )
                Defendants.             )
_____)

YOUNG, D.J.                                      August 25, 2022

**MEMORANDUM OF DECISION**

## I.   INTRODUCTION

Massachusetts, along with the vast majority of states,
authorizes public employees to elect organizations to serve as
their exclusive representatives in collective bargaining.  See
Mass. Gen. Laws ch. 150E, §§ 4-6; Harry C. Katz, Thomas A.
Kochan & Alexander J.S. Colvin, An Introduction to U.S.
Collective Bargaining and Labor Relations 331, 335 (5th ed.

2017) (stating that forty-one states confer a right to public-sector collective bargaining); Brief for the State of New York et al. as Amici Curiae in Support of Respondents at 7-8, 8 n.3, Harris v. Quinn, 573 U.S. 616 (2014) (No. 11-681) (detailing the respective statutes of forty-one states, the District of Columbia, and Puerto Rico authorizing exclusive representation in public-sector collective bargaining).  This system of exclusive representation is central to public-sector labor relations in the Commonwealth.  See Service Emps. Int'l Union, Local 509 v. Labor Rels. Comm'n, 431 Mass. 710, 714-15 (2000) (identifying "the exclusive representation concept" as "a basic building block of labor law policy" in Massachusetts); Branch v. Commonwealth Emp't Rels. Bd., 481 Mass. 810, 823-24 (2019) ("Exclusive representation . . . is necessary to effectively and efficiently negotiate collective bargaining agreements and thus promote peaceful and productive labor-management relations.").

Richard Peltz-Steele ("Peltz-Steele") claims it is unconstitutional.

A law professor at the University of Massachusetts School of Law at Dartmouth (the "University"), Peltz-Steele brings this First Amendment action challenging Massachusetts law governing public-sector unions.  He alleges, first, that the exclusive representation provisions of Massachusetts General Laws chapter 150E, sections 4, 5, and 6 abridge his right to be free from

compelled speech and association by forcing his association with
the Defendant UMass Faculty Federation, Local 1895 American
Federation of Teachers, AFL-CIO (the "Union") and his adoption
of its viewpoints (count one); and second, that the grievance
provisions of Massachusetts General Laws chapter 150E, sections
5 and 8 abridge his right to free speech by requiring that he
receive Union permission to submit employment grievances (count
two).

The Union and the Defendant state officials moved to
dismiss both claims.  Def. UMass Faculty Federation's Mot.
Dismiss Compl. Fed. R. Civ. P. 12(b)(6) ("Union's Mot.
Dismiss"), ECF No. 22; State Defs.' Mot. Dismiss, ECF No. 24.
At a hearing on May 11, 2022, the Court dismissed count two with
the assent of Peltz-Steele and dismissed count one after hearing
arguments from counsel.  See Electronic Clerk's Notes ("Clerk's
Notes"), ECF No. 33.

This Memorandum of Decision explains the Court's reasoning
as to the dismissal of count one and concludes that precedent
squarely -- and justifiably -- forecloses a First Amendment
challenge to exclusive representation for public-sector unions.

**A.   Procedural History**

On September 28, 2021, Peltz-Steele filed a complaint
against the Union and the following state officials in their
official capacities: Martin Meehan, President of the University

of Massachusetts system ("Meehan"); Marjorie Wittner, Kelly
Strong, and Joan Ackerstein, members of the Commonwealth
Employment Relations Board (the "Employment Relations Board");
and Maura Healey, Attorney General of the Commonwealth of
Massachusetts (collectively, the "State Defendants").  Compl. ¶¶
7-11.

He brings two counts under the First Amendment pursuant to
42 U.S.C. § 1983: count one challenges the exclusive
representation provisions of Massachusetts General Laws chapter
150E, sections 4, 5, and 6, id. ¶¶ 41-54; count two challenges
the grievance provisions of Massachusetts General Laws chapter
150E, sections 5 and 8, as they operate with the Collective
Bargaining Agreement between the Union and the University, id.
¶¶ 55-63.

As for count one, Peltz-Steele seeks (1) a judgment
declaring the exclusive representation provided for in
Massachusetts General Laws chapter 150E, sections 4, 5, and 6
unconstitutional, as well as (2) to enjoin (a) the various State
Defendants from recognizing the Union as the exclusive
representative and (b) the Union from acting as the exclusive
representative.  Id. ¶¶ a-e.  As for count two, Peltz-Steele
asks the Court to enjoin (1) Meehan "from forcing [Peltz-Steele]
to present all grievances through the Union," and (2) the Union

[4]

"from representing employees in grievance proceedings unless those employees consent to union representation."  Id. ¶¶ f-g.

The Union and the State Defendants each filed a motion to dismiss both counts.  See generally Union's Mot. Dismiss; State Defs.' Mot. Dismiss.  The parties fully briefed the motions.  See Mem. Law Supp. Def. UMass Faculty Federation's Mot. Dismiss. Compl. ("Union's Mem."), ECF No. 23;  Mem. Law Supp. State Defs.' Mot. Dismiss ("State Defs.' Mem."), ECF No. 25; Resp. Opp'n Def. UMass Faculty Federation's Mot. Dismiss Compl. ("Pl.'s Resp. Union's Mot."), ECF No. 27; Resp. Opp'n State Defs.' Mot. Dismiss ("Pl.'s Resp. State Defs.' Mot."), ECF No. 28.[1]

At a hearing on May 11, 2022, this Court allowed the motions to dismiss as to both counts of Peltz-Steele's complaint.  See Clerk's Notes.  With respect to count two, counsel for Peltz-Steele assented to dismissal.  Id.  After hearing arguments on count one, the Court ruled that Supreme Court and First Circuit precedent precluded the claim.  Id.

---

[1] Peltz-Steele's response to the State Defendants' motion to dismiss is materially identical to his response to the Union's motion to dismiss.  Accordingly, from this point forward, this Memorandum will cite only to his response to the Union's motion, ECF No. 27.

The Court now writes to explain its ruling on count one —- that is, to specify why exclusive bargaining arrangements do not run afoul of the First Amendment.

**B.   Massachusetts' System of Exclusive Representation**

This case involves provisions of the Massachusetts Public Sector Collective Bargaining Statute, Mass. Gen. Laws ch. 150E et seq. ("chapter 150E"), which governs labor relations between public employers and employees in Massachusetts.

Chapter 150E authorizes public employees to form organizations for purposes of negotiating with employers on terms of employment. See Mass. Gen. Laws ch. 150E, § 2. Section 4 of chapter 150E permits public employers to "recognize an employee organization designated by the majority of the employees in an appropriate bargaining unit as the **exclusive representative** of all the employees in such unit for the purpose of collective bargaining." See id. § 4 (emphasis added). Once the Employment Relations Board so certifies an organization, section 5 grants it "the right to act for and negotiate agreements covering **all employees in the unit**," id. § 5 (emphasis added), but requires that it represent their interests "without regard to employee organization membership," id. The exclusive representative organization has the power to bargain on behalf of all unit employees "with respect to wages, hours,

standards or productivity and performance, and any other terms and conditions of employment." Id. § 6.

## C. Facts Alleged

At all times relevant, the Union was the "exclusive bargaining representative" for a unit comprising professors and certain other professional employees at the University of Massachusetts School of Law at Dartmouth. See Compl. ¶ 30; Union's Mem., Ex. A, Collective Bargaining Agreement 1-2, ECF No. 23-1.[2] Peltz-Steele is "a senior faculty member with tenure" and "Chancellor Professor" at the University. Compl. ¶¶ 14, 24. Thus, Peltz-Steele is a member of the bargaining unit that the Union represents. Id. ¶¶ 16, 36; see also Collective Bargaining Agreement 1. He is not, however, a member of the Union and "does not wish to associate with the Union, including having the Union serve as his exclusive bargaining representative." Compl. ¶¶ 4, 16.

In September 2020, to offset financial losses sustained during the COVID-19 pandemic, the University entered into a

-----

[2] The Collective Bargaining Agreement, attached to the Union's memorandum in support of its motion to dismiss, is incorporated by reference in the complaint. See Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 23 (1st Cir. 2018) ("We may also augment those facts [from the complaint] with facts extractable from documentation annexed to or incorporated by reference in the complaint." (internal quotation marks omitted)).

memorandum of agreement with the Union cutting employee salaries (the "Salary Reduction Agreement").[3]  Id. ¶ 17; Union's Mem., Ex. B, Salary Reduction Agreement, ECF No. 23-2.

On September 4, 2020, Union President Grant O'Rielly ("O'Rielly") sent an email to members of the bargaining unit detailing the Union's negotiations with the University.  See Compl. ¶ 18.  According to O'Rielly, without salary cuts, "the University would have had to lay off some '[eighty-plus] employees.'"  Id. ¶ 19.  The University first requested "a [five percent] across the board cut to employee pay," id., but the Union rejected this proposal and "demand[ed] a 'progressive' structure that would impose different cuts on different employees depending on their salary level," id. ¶ 20.  The University agreed to this format.  Id.

The Salary Reduction Agreement ultimately provided for the following formula:

> a. There shall be no reduction on the first $30,000 of regular salary and any regular contractual or other stipend for any faculty or staff member.
> b. For each $5,000 in excess of $30,000 there shall be a salary reduction calculated as a percentage of the faculty or staff member's marginal salary. This percentage reduction shall start at five percent and shall increase by one percentage-point for each step up to a maximum of ten percent.

---

[3] The Salary Reduction Agreement, Union's Mem., Ex. B, Salary Reduction Agreement, ECF No. 23-2, is incorporated by reference in the complaint.  See Newman, 901 F.3d at 23.

Salary Reduction Agreement 2.

With respect to Peltz-Steele, "this formula results in a cut in income of about [twelve percent], when including a law-school specific cut of $7,500 in research support that had already been imposed." Compl. ¶ 23. Moreover, "the effects of these cuts on junior, less job secure faculty is even more severe"; for example, Peltz-Steele "is personally aware of at least one junior colleague whose salary reduction put them below the level at which they were hired." Id. ¶ 24. In fact, "given the existing salary scale at the law school, all full[-]time law faculty are worse off under the Union's plan than under the University's original proposal." Id.

In their negotiations, "[t]he Union and the University rejected or failed to consider" other avenues of cost reduction, including "a reduction in redundant administrative staff, extended voluntary furloughs, intangible incentives such as faculty course releases, or tapping into the UMass System's $114 million dollar 'rainy day fund,' which exists for just such an emergency." Id. ¶ 21.

The Union's status as exclusive representative prevented Peltz-Steele "from negotiating separately with his employer, or even proposing an alternative solution to the University's financial situation." Id. ¶ 25.

## II.   PLEADING STANDARD

To withstand a motion to dismiss, a complaint must "state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).  The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (brackets, ellipsis, and quotations omitted).

## III. ANALYSIS

Peltz-Steele claims that designating the Union the exclusive representative of his bargaining unit violates his First Amendment rights by compelling him (1) "to associate with the Union" against his wishes and (2) "to petition the government with a certain viewpoint" contrary to his own. Compl. ¶ 52.

The parties' arguments center on the applicability of certain Supreme Court and First Circuit precedent.  The Union and State Defendants assert that a facial challenge to exclusive representation is plainly foreclosed by Minnesota State Board

[10]

for Community Colleges v. Knight, 465 U.S. 271 (1984),
D'Agostino v. Baker, 812 F.3d 240 (1st Cir. 2016), cert. denied,
579 U.S. 909 (2016), and Reisman v. Associated Faculties of the
University of Maine, 939 F.3d 409 (1st Cir. 2019), cert. denied,
141 S. Ct. 445 (2020).  See Union's Mem. 5-9; State Defs.' Mem.
7-12.  In response, Peltz-Steele argues that Knight, D'Agostino,
and Reisman are distinguishable or, alternatively, no longer
good law in light of Janus v. AFSCME, Council 31, 138 S. Ct.
2448 (2018).  See Pl.'s Resp. Union's Mot. 5-9.

The Defendants are correct.  First, Knight, D'Agostino, and
Reisman plainly apply to Peltz-Steele's claims, as all three
contemplated the First Amendment implications of exclusive
representation on non-union dissenters and, to varying degrees,
theories of compelled association or compelled speech.  Knight,
465 U.S. at 289; D'Agostino, 812 F.3d at 244; Reisman, 939 F.3d
at 414.  Second, Knight and its progeny are not superseded by
Janus -- as determined by the First Circuit in Reisman, 939 F.3d
at 414, and expressly stated by the Supreme Court in Janus, 138
S. Ct. at 2478.  Third, under the above precedent, Peltz-Steele
has not stated a claim for compelled association or speech, as
he is (1) free not to join the Union, see Knight, 465 U.S. at
289, and (2) not required to adopt the Union's speech -- either
actually or apparently, see D'Agostino, 812 F.3d at 244;

Reisman, 939 F.3d at 414.  Thus, count one of Peltz-Steele's complaint fails.

### A.    The Scope of Knight

The Union and State Defendants assert that Peltz-Steele's compelled speech and association claims fail under Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271 (1984) and, by extension,  D'Agostino v. Baker, 812 F.3d 240 (1st Cir. 2016).  See Union's Mem. 2; State Defs.' Mem. 9. Peltz-Steele counters that Knight is limited to the narrow set of facts under which it was decided and does not apply to First Amendment theories of compelled speech and association.  Pl.'s Resp. Union's Mot. 5-7.  Peltz-Steele's attempts to distinguish are unavailing; Knight and D'Agostino apply squarely to his claims.

### 1.    A Summary of Knight

Knight involved a Minnesota statute authorizing public employees to select exclusive bargaining agents to "meet and negotiate" mandatory matters of employment.  465 U.S. at 274. The statute also provided that, where professional employees had an exclusive representative, their employers could not "meet and confer" with anyone apart from the exclusive representative on employment matters even outside the scope of mandatory collective bargaining.  Id. at 274-75.  Community college faculty challenged the law, claiming it violated their First

Amendment rights by (1) denying their "entitlement to a government audience for their views," id. at 282, and (2) restricting their freedom of speech and association, id. at 288. First, the Supreme Court held that the plaintiffs had "no constitutional right to force the government to listen to their views," whether "as members of the public, as government employees, or as instructors in an institution of higher education." Id. at 283.  Second, the Supreme Court held that the law "in no way restrained [the plaintiffs]' freedom to speak on any education-related issue or their freedom to associate or not to associate with whom they please, including the exclusive representative." Id. at 288.

Peltz-Steele advances a narrow reading of Knight.  Knight, he claims, "did not consider a compelled-speech or compelled-association challenge to exclusive bargaining schemes," but, rather, only addressed whether "public workers had a right to be heard by the state in certain 'meet and confer' sessions with union representatives."  Pl.'s Resp. Union's Mot. 2.  He cites to language in Knight indicating that the plaintiffs' primary claim was "a right to force officers of the State . . . to listen to them in a particular formal setting."  Id. 6 (quoting Knight, 465 U.S. at 282).  Unlike those plaintiffs, Peltz-Steele asserts, he "does not claim that his employer -- or anyone else -- should be compelled to listen to his views"; he simply asks

"whether someone else can speak in his name, with his imprimatur granted to it by the government." Id.  Thus, he argues, Knight is immaterial.  Id. 5.

   The First Circuit would disagree.

### 2.  The First Circuit's Reading of Knight

   In D'Agostino v. Baker, the First Circuit rejected a challenge to a Massachusetts statutory scheme deeming childcare providers "public employees" and authorizing them to elect an exclusive bargaining agent pursuant to chapter 150E.  812 F.3d at 242-43.  The childcare providers, like Peltz-Steele, had claimed that Massachusetts' system of exclusive representation violated their First Amendment rights against compelled speech and association.  See Compl. ¶ 32, D'Agostino v. Patrick, 98 F. Supp. 3d 109 (D. Mass. 2015) (Sorokin, J.), aff'd sub nom. D'Agostino v. Baker, 812 F.3d 240 (1st Cir. 2016) (No. 14-cv-11866), ECF No. 17.  Basing its decision in part on Knight, the First Circuit reasoned that (1) the providers' freedom "to speak out publicly on any union position . . . counters the claim that there is an unacceptable risk the union speech will be attributed to them contrary to their own views," and (2) the union's duty to fairly represent the providers as their exclusive bargaining agent did not "impermissibly compel[] association" with the union.  D'Agostino, 812 F.3d at 244. Accordingly, D'Agostino held that "exclusive bargaining

representation by a democratically selected union does not, without more, violate" the speech or associational rights of dissenting employees in a bargaining unit.  Id. at 243-45.

D'Agostino applies plainly to this case, yet Peltz-Steele argues D'Agostino is not controlling because it misinterprets Knight.  Pl.'s Resp. Union's Mot. 7.  Regardless whether Peltz-Steele's reading of Knight has merit, this Court is bound by First Circuit precedent.  See, e.g., Specialty Retailers, Inc. v. Main St. NA Parkade, LLC, 804 F. Supp. 2d 68, 72 (D. Mass. 2011) ("[A] district court in this circuit is bound by a prior ruling of the Court of Appeals until that ruling is either vacated by a subsequent decision of the Court of Appeals or rendered non-viable by a ruling of the Supreme Court." (ellipsis omitted)).

A brief examination of Knight nevertheless reveals that Peltz-Steele misapprehends its scope.

### 3.  Whether Knight and D'Agostino Apply Here

As an initial matter, D'Agostino is not an aberration; every circuit to decide the issue has held that Knight applies to compelled speech and compelled association claims.  See, e.g., Jarvis v. Cuomo, 660 F. App'x 72, 74 (2d Cir. 2016) (deeming the argument that exclusive representation violates the First Amendment by "compel[ling] union association" to be "foreclosed by [Knight]"), cert. denied, 137 S. Ct. 1204 (2017);

[15]

Adams v. Teamsters Union Local 429, 2022 WL 186045, at *2 (3d
Cir. Jan. 20, 2022) (stating that portraying Knight as "only
about whether the employees could demand a forum with their
employer" is "simply at odds with what it says," and holding
that "Knight foreclose[d] the First Amendment [speech and
association] challenge"); Akers v. Md. State Educ. Ass'n, 990
F.3d 375, 382 n.3 (4th Cir. 2021) (holding that Knight
"foreclosed" the freedom of association claim, as Knight held
that Minnesota's exclusive representation regime "did not
violate speech and associational rights of those who were not
members of [the] organization selected as exclusive
representative"); Thompson v. Marietta Educ. Ass'n, 972 F.3d
809, 813-14 (6th Cir. 2020) (holding that Knight precluded the
First Amendment compelled speech and association challenge to
exclusive representation and stating that the plaintiff's
attempt to distinguish Knight constituted "such a cramped
reading of Knight" that it "would functionally overrule the
decision"), cert. denied, 141 S. Ct. 2721 (2021); Bennett v.
Council 31 of the AFSCME, 991 F.3d 724, 734-35 (7th Cir. 2021
(rejecting the plaintiff's argument that Knight "addressed only
whether the plaintiffs could force the government to listen to
their views," stating that "Knight speaks directly to the
constitutionality of exclusive representation," and holding that
Knight barred the free speech and association claim), cert.

denied sub nom. Bennett v. Am. Fed'n of State, Cty., & Mun.
Emps., Council 31,  142 S. Ct. 424 (2021); Bierman v. Dayton,
900 F.3d 570, 574 (8th Cir. 2018) (holding that Knight
"summarily affirmed the constitutionality of exclusive
representation for subjects of mandatory bargaining" and thereby
foreclosed the claim that the "'mandatory agency relationship'
between [public employees] and the exclusive representative []
violates their right to free association"), cert. denied sub
nom. Bierman v. Walz, 139 S. Ct. 2043 (2019); Mentele v. Inslee,
916 F.3d 783, 788-89 (9th Cir. 2019) (stating that "Knight is
the most appropriate guide" for a compelled association
challenge and rejecting the claim under Knight), cert. denied
sub nom Miller v. Inslee, 140 S. Ct. 114 (2019); Hendrickson v.
AFSCME Council 18, 992 F.3d 950, 969 (10th Cir. 2021) (holding
that Knight "found exclusive representation constitutionally
permissible" and "thus belies [the plaintiff]'s claim that
exclusive representation imposes [compelled speech and
association] in violation of the First Amendment").

This consensus ought come as no surprise. While the
precise claims made in Knight may differ slightly from the
present case, its holding is unambiguous: exclusive
representation by public-sector labor unions does not violate
the speech or associational rights of non-union members. See
Knight at 288. That Knight involved "meet and confer" sessions

does not meaningfully distinguish it from D'Agostino or the case
at bar; as stated by the First Circuit, if the Knight plaintiffs
"could claim no violation of associational rights by an
exclusive bargaining agent" in "dealing with the state **even
outside collective bargaining**, the same understanding of the
First Amendment should govern" where a plaintiff's "objection
goes only to bargaining representation." D'Agostino, 812 F.3d
at 243 (emphasis added). Moreover, the Supreme Court in Knight
addressed compelled association in stating that the plaintiffs'
"associational freedom ha[d] not been impaired" because they
were "free to form whatever advocacy groups they like" and were
"**not required to become members of**" **the union**. Knight, 465 U.S.
at 289 (emphasis added). Any pressure the non-union members
felt to join the union or adopt its views was "no different from
the pressure to join a majority party that persons in the
minority always feel." Id. 290.

Thus, contrary to Peltz-Steele's contentions, Knight is
"responsive to the question [he] now raises." Pl.'s Resp.
Union's Mot. 6.

**B.  The Effect of Janus on Knight**

Peltz-Steele next asserts that to the extent Knight and
D'Agostino apply to his claims, they were superseded by the
Supreme Court's decision in Janus v. AFSCME, Council 31, 138 S.
Ct. 2448 (2018). See Pl.'s Resp. Union's Mot. 7-9. The Union

[18]

and State Defendants counter that the holding in Janus is narrow
and does not implicate Knight or D'Agostino.  Union's Mem. 8-9;
State Defs.' Mem. 11-12.  The Defendants are correct; Janus did
not undermine the constitutionality of exclusive representation.

### 1.   A Summary of Janus

Janus involved a First Amendment challenge to "agency fees"
–- mandatory charges assessed to non-union members to compensate
a union for costs incurred in collective bargaining.  Janus, 138
S. Ct. at 2460-61.  In examining Illinois' agency fee
arrangement under "exacting scrutiny," the Janus Court assumed
that labor peace was a compelling state interest but concluded
that it could "readily be achieved through" less restrictive
means.  Id. at 2466.  Accordingly, the Supreme Court held that
public-sector union-shop arrangements "violate[] the free speech
rights of nonmembers by compelling them to subsidize private
speech on matters of substantial public concern."  Id. at 2460.
In so holding, Janus overturned Abood v. Detroit Board of
Education, 431 U.S. 209, 262 (1977), which had previously held
agency-fee arrangements constitutional, see Janus, 138 S. Ct. at
2460.

Although not at issue in the case, Janus alluded to the
First Amendment implications of exclusive representation:

> It is also **not disputed** that the State may require
> that a union serve as exclusive bargaining agent for
> its employees -- itself a **significant impingement on**

> **associational freedoms** that would not be tolerated in
> other contexts.  We simply **draw the line** at allowing
> the government to go further still and require all
> employees to support the union irrespective of whether
> they share its views.

Janus, 138 S. Ct. at 2478 (emphasis added).

Peltz-Steele asserts that the logic of Janus -- and this passage in particular -- effectively rendered D'Agostino, which relied on Knight and Abood, inoperative.  Pl.'s Resp. Union's Mot. 2.  Yet again, Peltz-Steele asks the Court to exercise a power it lacks: whether Janus merits reconsideration of D'Agostino is for the First Circuit to decide.  See Briand v. Lavigne, 223 F. Supp. 2d 241, 247 (D. Me. 2002) ("A lower federal court in this Circuit is bound by First Circuit precedent even if a subsequent Supreme Court decision might justify a reevaluation of that holding."); Carpenters Local Union No. 26 v. United States Fid. & Guar. Co., 215 F.3d 136, 138 (1st Cir. 2000) ("We have considerably greater freedom than the district courts to evaluate the impact of recent Supreme Court precedent on our previous decisions.").

What is more, the First Circuit has already answered the question.

### 2.  The First Circuit's Reading of Janus

In Reisman v. Associated Faculties of the University of Maine, the First Circuit rejected a college professor's post-Janus challenge to Maine's statutory scheme authorizing

professional employees to elect an exclusive representative to bargain with the university system.  939 F.3d 409, 410-11 (1st Cir. 2019).  The Reisman Court reasoned that the statute did not designate the union the professor's **personal** representative, but rather the representative of his "[bargaining] **unit** as an entity."  Id. at 413 (emphasis added).  Accordingly, Knight and D'Agostino disposed of the professor's compelled speech and association claims.  Id. at 414.  The First Circuit in Reisman expressly acknowledged that "D'Agostino was decided prior to Janus," but determined that Janus did not provide "a basis for overturning D'Agostino."  Id. at 414.

Reisman would therefore seem to dispose of the issue. Peltz-Steele, however, claims "Reisman is inapposite for at least three reasons."  Pl.'s Resp. Union's Mot. 8.

First, he argues that Reisman was grounded in "the statutory text of the Maine exclusive bargaining law," which "repeatedly makes clear that a union" represents the **"bargaining unit** only and not **individual employees**."  Id. (emphasis added). This is a pained distinction.

Admittedly, chapter 150E contains language indicating that an exclusive bargaining agent has "the right to act for and negotiate agreements covering all employees in the unit," and is "responsible for representing the interests of all such employees," Mass. Gen. Laws ch. 150E, § 4.  The Maine statute,

however, contains similar language.  <u>See</u> Me. Stat. tit. 26, §
1025(2)(E) ("[T]he exclusive bargaining agent for a unit is
required to represent all the university, academy or community
college **employees** within the unit without regard to membership .
. . ." (emphasis added)); <u>id.</u> § 1022 (providing that "one of
[the exclusive bargaining agent's] primary purposes [is] the
representation of **employees** in their employment relations with
employers" (emphasis added)).

      Moreover, like Maine's statutory scheme, other provisions
of chapter 150E suggest that the exclusive bargaining agent
represents the bargaining unit as an **entity**.  <u>See</u> Mass. Gen. Law
ch. 150E, § 1 (defining "[w]ritten majority authorization" as
"writings . . . in which a majority of employees in an
appropriate bargaining **unit** designates an employee organization
as **its** representative for the purpose of collective bargaining"
(emphasis added)); <u>id.</u> § 4 (describing the process by which the
commission receives "a petition filed by or on behalf of a
substantial number of the employees in a **unit** alleging that the
exclusive representative **therefor** no longer represents a
majority of the employees therein" (emphasis added)).[4]  As the

---

[4] Further muddying the waters, another provision in chapter
150E indicates that public employees are represented by their
bargaining units.  <u>See</u> Mass. Gen. Laws ch. 150E, § 3 ("[C]ourt
officers . . . shall be **represented** by such other bargaining
**units** as they may elect." (emphasis added)).

First Circuit concluded in Reisman, here, the statutory scheme
does not recognize the Union as Peltz-Steele's personal
representative, but rather mandates that the Union represent the
bargaining unit fairly and in its entirety -- "not only certain
of the employees within it, and then solely for the purposes of
collective bargaining." Reisman, 939 F.3d at 413. The law is
"devoid of any hint" that a union's duty to fairly represent
members and non-members alike "results in impermissibly
compelled association." See D'Agostino, 812 F.3d at 244.

Having failed to distinguish Reisman, Peltz-Steele next
argues that Reisman is invalid because it (1) incorrectly
reasoned "that Knight is controlling precedent," and (2)
erroneously suggested "that D'Agostino's reliance on Knight is
appropriate even in light of . . . Janus." Pl.'s Resp. Union's
Mot. 9. The former argument fails because Knight is controlling
precedent in this case. See supra section III.B. The latter
fails because, as discussed, it is not for this Court to decide
whether Janus merits reconsideration of D'Agostino. See supra
section III.C.1.

An appraisal of the caselaw nonetheless shows that Janus
did not go so far.

### 3.   **Whether Janus Applies Here**

Like D'Agostino, Reisman is by no means an outlier: every
circuit to hear a post-Janus challenge has rejected the notion

that Janus overrules Knight or undermines the constitutionality
of exclusive representation.  See, e.g., Adams, 2022 WL 186045,
at *6 (holding that "[n]othing in Janus undermines Knight or
exclusive-representation laws"); Akers, 990 F.3d at 382 n.3
(holding post-Janus that the First Amendment challenge to
exclusive representation was barred by Knight); Thompson, 972
F.3d at 811-12 (concluding that "when the Supreme Court decided
Janus, it left on the books Knight," which "directly controls
the outcome of" the First Amendment claim against exclusive
representation); Bennett, 991 F.3d at 735 (explaining that
"Janus did not mention, let alone overrule, Knight or otherwise
question the constitutionality of a system of labor relations
based on exclusive representation"); Bierman, 900 F.3d at 574
(holding that Janus did not overrule Knight and explaining that,
"where a precedent like Knight has direct application in a case,
[courts] should follow it, even if a later decision arguably
undermines some of its reasoning"); Mentele, 916 F.3d at 789
(holding that Janus did not overrule Knight and "leav[ing] to
the Supreme Court the prerogative of overruling its own
decisions" where "directly applicable precedent" exists);
Hendrickson, 992 F.3d at 969  (explaining that Janus
"reinforces" the holding in Knight that exclusive representation
is constitutionally permissible).

Furthermore, although not controlling here, the Massachusetts Supreme Judicial Court held in 2019 that a "First Amendment challenge to the exclusive representation provisions of [chapter] 150E is foreclosed by Supreme Court precedent," reasoning that Janus "did not in any way question the centrality" or "the constitutionality of exclusive representation." Branch v. Commonwealth Emp't Rels. Bd., 481 Mass. 810, 812, 823-24 (2019), cert. denied sub nom. Branch v. Mass. Dep't of Labor, 140 S. Ct. 858 (2020).

Courts' unanimous response to this question is for good reason. Janus did not once mention Knight. Moreover, the Janus Court expressly distinguished exclusive representation from agency-fee arrangements, explaining that the "designation of a union as the exclusive representative of all employees in a unit" is not "inextricably linked" with "the exaction of agency fees." Janus, 138 S. Ct. at 2465. The Supreme Court further explained that it was "not disputed that the State may require that a union serve as exclusive bargaining agent for its employees," but it was "simply draw[ing] the line at allowing the government to go further still and require all employees [financially] to support the union irrespective of whether they share its views." Id. at 2478.

This distinction is sensible: "to compel a man to furnish contributions of money for the propagation of opinions which he

disbelieves," Janus, 138 S. Ct. at 2464, is a far cry from allowing a democratically elected agent to represent a bargaining unit consisting of dissenters, where "it is readily understood that employees in the minority, union or not, will probably disagree with some positions taken by the agent answerable to the majority," D'Agostino, 812 F.3d at 244.

Peltz-Steele's reliance on Janus is therefore misplaced.

### C.   The Fate of Peltz-Steele's Claims

Under Knight, D'Agostino, and Reisman, Peltz-Steele's compelled speech and association claims fail.

Peltz-Steele is free not to join the Union that represents his bargaining unit, see Knight, 465 U.S. at 288-89 -- a freedom he has exercised, see Compl. ¶¶ 4, 16.  He is free not to endorse the Union's viewpoint and, further, openly to dissent, see D'Agostino, 812 F.3d at 244; Knight, 465 U.S. at 288 -- another freedom he has put to use.  He is "not compelled to act as [a] public bearer" of the Union's message, see D'Agostino, 812 F.3d at 244 (citing Wooley v. Maynard, 430 U.S. 705 (1977)), nor would he appear to a reasonable observer to adopt any or all positions taken by the Union, merely as a member of the bargaining unit, see D'Agostino, 812 F.3d at 244; Reisman, 939 F.3d at 414.  He is not entitled to -- and thus cannot be wrongfully denied -- an audience with the State to negotiate his employment, see Knight, 465 U.S. at 283, a claim to which he

alludes, see Compl. ¶ 25, but wisely does not defend, see Pl.'s Resp. Union's Mot. 6.  Lastly, he is not required to subsidize the Union's speech, Janus, 138 S. Ct. at 2460, nor to perform an act analogous thereto.  In brief, Peltz-Steele's First Amendment rights remain intact.

While precedent compels this outcome, so too do commonsense understandings of representative relationships.  Although private in nature, exclusive union representation echoes the representative structures of American democracy both in its assets and its imperfections, fostering a majoritarianism tempered by constraints of fair representation but which inescapably yields a dissenting minority.  See Kate Andrias, Janus's Two Faces, 2018 Sup. Ct. Rev. 21, 37 (describing a union as "a majoritarian body that must represent all workers in the bargaining unit fairly," a function analogous to government's role as "representative of the people").  Non-union dissenters may feel aggrieved that their policy preferences do not prevail; like a voter whose disfavored political party holds office, however, they are neither required to join the representative union nor perceived as endorsing its conduct.  See Knight, 465 U.S. at 289-90; D'Agostino, 812 F.3d at 244; see also Charlotte Garden, Is There an Anti-Democracy Principle in the Post-Janus v. AFSCME First Amendment?, 2020 U. Chi. Legal F. 77, 91 (explaining that "[n]o reasonable observer would attribute a

government's views to each voter," and "[i]n the same way, no reasonable observer would assume that every union-represented worker supports the union's positions").  Their First Amendment rights are left unscathed.

## IV.  CONCLUSION

In sum, an exclusive union representative neither unlawfully compels dissenting public employees to associate with it nor bears their imprimatur when it speaks; to hold otherwise would contravene binding precedent and the assumptions underlying representative relationships.  Thus, the Court allowed the Union's and State Defendants' motions to dismiss count one of Peltz-Steele's complaint challenging Massachusetts' system of exclusive representation.

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[5]

---

[5] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.